United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Targus International LLC, Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 20-21435-Civ-Scola |
| | ) |
| Group III International, Inc., | ) |
| Defendant. | ) |

**Order on Claim Construction**

    Plaintiff Targus International LLC complains Defendant Group III International, Inc., has infringed its patent—U.S. Patent No. 8,567,578 (the "'578 Patent" or "Patent")—which protects innovations related to its line of "checkpoint-friendly" laptop bags and cases. (Compl., ECF No. 1.) Before the Court is the parties' claim-construction briefing. (Pl.'s Mot., ECF No. 107; Def.'s Resp., ECF No. 119; Pl.'s Reply, ECF No. 131.) The Court held a hearing on December 19, 2022, where the parties presented argument, and the Court has carefully reviewed the briefing, the record, and the relevant legal authorities. After full consideration, the Court finds none of the contested terms require construction and agrees with the parties' proposed construction of a term the parties say is now undisputed. Accordingly, the Court **grants, in large part**, the relief Targus requests in its opening claim-construction brief (**ECF No. 107**).

    **1. Background**

    Both parties agree that the claimed bag design is "straightforward." (Pl.'s Mot. at 5; Def.'s Resp. at 5.) The '578 Patent describes and claims a computer case designed to pass through screening at security checkpoints without removing the computer from the case. In broad terms, the Patent teaches a bifold case for holding objects in a first storage section and a laptop computer in a separate, second storage section. When the case unfolds, objects in the first storage section do not overlap with the computer in the second storage section.

    The parties agree claim 1 of the patent is representative of the patent claims and is reprinted below, with emphasis added to highlight the disputed language:

    1. A bi-fold case to allow for convenient security screening of a
       computer, comprising:

a first storage section comprising a first outer side, *a first inner side*, a first proximal end, and a first distal end opposite the first proximal end, the first outer side, *first inner side*, first proximal end, and first distal end defining a *first pouch* with a *first pouch* opening and a *first pouch* fastener coupled to the *first pouch* opening and configured to only secure the *first pouch* opening, wherein the *first* outer and *inner sides* are configured to enable a scanning device to scan through[1] the *first* outer and *inner sides* and scan an interior of the *first pouch*, wherein the first storage section further comprises a third pouch including a third pouch opening, independent of the *first pouch* opening, and a third fastener to only secure the third pouch opening; and

a second storage section comprising a second outer side, a *second inner* side having a surface area approximately equal to a surface area of the *first inner side*, a second proximal end, and a second distal end opposite the second proximal end, the second storage section comprising,

> a *second pouch* and the second storage section configured without an additional pouch, the *second pouch* configured to receive a computer, wherein the second storage section and the *second* outer and *inner sides* are configured to enable a scanning device to scan through the *second* outer and *inner sides* and scan an interior of the *second pouch* and a computer disposed therein, and
>
> a *second pouch* fastener configured to *substantially enclose* only the *second pouch* and thereby retain a computer therein,

the second storage section foldably joined at the second proximal end to the first proximal end of the first storage section such that the second proximal end and the first proximal end are coupled adjacent one another to form a *hinge* configured to enable a scanning device to scan through the *hinge*,

wherein the *first and second inner sides* are disposed adjacent one another in the folded configuration and separated in an unfolded configuration,

wherein the first and second distal ends are disposed adjacent one another in the folded configuration and separated from one another in the unfolded configuration,

wherein in the unfolded configuration with the outer sides of both the first and second storage sections laid flat upon a same planar

---

[1] The term "configured to enable a scanning device to scan through" was initially disputed but the parties have since stipulated to Targus's construction—"made of materials that do not interfere with a scanning device." The Court adopts the parties' agreed to construction.

> surface, an object in the first storage section is removed from interfering with a scanner positioned above and below the second storage section to enable uninhibited scanning of a computer in the *second pouch* of the second storage section.

(Ex. 1, '578 Patent, ECF No. 106-1 at 20:5-57 (formatting approximates original; emphasis added).)

### 2. Legal Standard

It is the exclusive province of the Court to determine the meaning and scope of a patent claim. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 321 (2015). But claim construction is required only when "the meaning or scope of technical terms and words of art is unclear and in dispute and requires resolution" by the Court. *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1360 (Fed. Cir. 2004). That is, absent "a fundamental dispute regarding the scope of a claim term," construction is not required. *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). The goal of claim construction is to give disputed terms their "ordinary and customary meaning" as the term would mean to "a person of ordinary skill in the art in question . . . as of the effective filing date of the patent application." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). A person of ordinary skill in the relevant art is the standard used because patents are addressed to others skilled in the pertinent art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

When a term requires construction, the Court's task is a limited one. The Court must construe only those terms that are in controversy, and "only to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Sc. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999). Claim construction involves defining a term in its appropriate context. "[T]here is no magic formula . . . for conducting claim construction. Nor is the court barred from considering any particular sources or required to analyze the sources in any specific sequence[.]" *Phillips*, 415 F.3d at 1324. "To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history." *Markman*, 52 F.3d at 979 (cleaned up).

The claim itself often provides substantial guidance as to the meaning of particular claim terms. *See Vitronics*, 90 F.3d at 1582. Because claim terms are normally used in a consistent manner throughout a patent, usage of a term in one claim can illuminate the meaning of the same term in another claim. *Phillips*, 415 F.3d at 1324.

The claims must also "be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979 (cleaned up). "The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention." *Id.* Furthermore, a patent's specification is "always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. For this reason, the specification is "the primary basis for construing the claims." *Phillips*, 415 F.3d at 1315. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.*, at 1316.

Courts also consider a patent's prosecution history, if it is in evidence, to illuminate a disputed term. *Markman*, 52 F.3d at 980. A patent's prosecution history can consist of the complete record of the proceedings before the United States Patent Trademark Office ("USPTO") and can include the prior art cited during the examination of the patent, which, like the specification, can shed light on how the inventor and USPTO understood the patent. *Phillips*, 415 F.3d at 1317. However, courts are wary of placing too much emphasis on the prosecution history because it reflects an ongoing negotiation between the USPTO and the inventor, and thus can lack the clarity needed to be a helpful resource. *See Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (concluding that the evidence in the patent's prosecution history produced contradictory interpretations). Nonetheless, when the prosecution history in evidence clearly disclaims an interpretation, the disclaimed interpretation should be excluded from the claim construction. *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988).

Finally, the Court may also rely upon extrinsic evidence, such as treatises and dictionaries, to illuminate the meaning of claim terms. Because extrinsic evidence is external to the patent, sometimes authored by persons not skilled in the art in question, and does not have the benefit of being created at the time of, or in view of, the asserted patents, it is considered less reliable, and thus, holds less weight in claim construction. *Phillips*, 415 F.3d at 1318 (explaining reasons why extrinsic evidence is generally less reliable than intrinsic evidence in determining how to read claims).

In sum, the Court construes only those claim terms which require construction, and only then to the extent necessary to resolve the dispute. The Court looks first to the claim itself and the specification. The Court may also consider the patent's prosecution history and various extrinsic sources, though extrinsic evidence is weighted less than intrinsic evidence in claim construction.

### 3. Analysis

The parties' competing constructions of the claim language are summarized as follows:

| Claim Term | Targus's Proposed Construction | Group III's Proposed Construction |
|---|---|---|
| "a hinge" (claims 1, 17, 21, 22, 28, 42, 50, 57) | no construction necessary | "a structure made only of rigid, non-metallic components, which cannot be defined as (a) 'foldable material,' (b) 'deformable material or fabric,' or (c) 'straps,' the structure allowing two sections of a case to fold or pivotally joined [sic] onto each other." |
| "substantially enclose" (claim 1) | "substantially contain" | "not enclose" |
| "a first pouch" (claims 1, 17, 21, 22, 28, 42, 48, 50, 57) | either: no construction necessary *or* construe "pouch" as "a pocket or partially enclosed receptacle" | "Parts of a case that retain an object on at least the bottom and the sides of the object" |
| "a second pouch" (claims 1, 4, 6, 17, 21, 22, 27, 28, 32, 42, 47, 48, 50, 57) | | "Parts of a case that retain an object on at least the bottom and the sides of the object and that are not the same parts as those that make up the 'first pouch.'" |
| "a first inner side" (claims 1, 17, 21, 22, 28, 42, 50, 57) | either: no construction necessary *or* construe as "first interior side" | "Any surface located within a case, including a surface opposite the 'first outer side' on the same panel as the 'first outer side.'" |
| "a second inner side" (claims 1, 17, 19, 21, 22, 28, 31, 32, 33, 42, 50, 57) | Either: no construction necessary *or* construe as "second interior side" | "Any side located within a case that is not the 'first inner side,' including a surface opposite the 'second outer side' on the same panel as the 'second outer side.'" |

### A. "hinge"

Targus maintains the word "hinge" needs no construction because the jury will have no difficulty understanding its plain meaning. As Targus explains it, the '578 Patent claims use "hinge" to describe a "foldable joint." (Pl.'s Mot. at 9 (quoting, as an example, claim 1 of the '578 Patent: "the second storage section [is] foldably joined at the second proximal end to the first proximal end of the first storage section . . . to form a hinge . . . .").)

In opposition, although Group III does not dispute Targus's position that a jury would have no difficulty understanding the plain meaning of the word "hinge," it nonetheless urges the Court to construe "hinge" such that it excludes any joining components made with "foldable material," "deformable

material," "fabric," or "straps." (*E.g.*, Def.'s Resp. at 10, 12.) Additionally, says Group III, the claimed "hinge" should be construed as limited to being made only of "rigid, non-metallic components." (*Id.*)

Group III's argument relies on its theory that the '578 Patent's specifications list four (or five) distinct mechanisms for connecting the first storage section to the second storage section, only one of which is called a "hinge." (Def.'s Resp. at 10 ("The '578 Patent describes four specific mechanisms for connecting the first storage section to the second . . . ."); *id.* at 12 ("the '578 Patent described at least five alternative choices for connecting the two storage sections together"). These different mechanisms, as Group III characterizes them, are connections between the two sections using (1) deformable material; (2) foldable material; (3) fabric; (4); a strap; or (5) a hinge. (*Id.* at 12.) As Group III sees it, these five different mechanisms are all mutually exclusive. Accordingly, because Targus has only claimed a "hinge," as the component or structure that joins the two sections, Group III reasons Targus has necessarily disclaimed the other four mechanisms. The Court disagrees.

In pushing its theory, Group III insists that "hinge" should not receive its ordinary and customary meaning and should, instead, be limited as described above. As a starting point, "a claim term will not receive its ordinary and customary meaning only in limited situations." *W.E. Hall Co., Inc. v. Atlanta Corrugating, LLC*, 370 F.3d 1343, 1353 (Fed. Cir. 2004). Among those situations are:

> where the patentee has acted as his own lexicographer and clearly provided an alternate definition for the term; where the intrinsic evidence shows that the patentee distinguished his invention from a prior art reference, expressly disclaimed subject matter, or highlighted a particular feature as important to the invention; or, where the term chosen makes the scope of the claim so unclear as to require resort to the intrinsic evidence for meaning."

*Id.* Group III fails to show that any of these circumstances are present in this case. Instead, Group III's argument is that, because the patent specifications set forth "a list of choices for connecting the storage sections"—(1) deformable material; (2) foldable material; (3) fabric; (4); a strap; or (5) a hinge—and the claim identifies only one of them—a hinge—the other four options are, by implication, necessarily disclaimed. To limit the term "hinge" in this way, though, would be to ignore the context of both (1) how the term is used in the claim and (2) the nature of the list in the specifications on which Group III focuses.

The '578 Patent claims use the term "hinge" to describe the part of the case where the "second storage section [is] foldably joined at the second

proximal end to the first proximal end of the first storage section such that the second proximal end and the first proximal end are coupled adjacent [to] one another." (*E.g.* Claim 1, 20:42–44 (describing the formation of a "hinge" where "the second storage section [is] foldably joined at the second proximal end to the first proximal end of the first storage section"); Claim 17, 22:3–5 (describing the folding connection of "the first and second proximal ends" of the first and second storage sections as "forming a hinge"); Claim 18, 24:50–53 ("foldably joining the first storage section to the second storage section at the first and second proximal ends to for a hinge").) Read in isolation, the Court finds no difficulty in applying the ordinary and customary meaning of the term "hinge" here as a description of the mechanics of how the sections foldably separate from one another while remaining attached along their proximal ends. The use of the term "hinge" here implies no obvious limitation on or specification of the materials that make up that hinge, as Group III urges.

  Nor do the lists set forth in the specifications. Group III makes the mistake of assuming that, because items are presented in a list, connected by "or," each item represents a mutually exclusive option. That is, says Group III, "'[H]inge' must be interpreted as something *other than* 'deformable material,' 'foldable material,' 'fabric,' or a 'strap.'" (Def.'s Resp. at 15 (emphasis in original).) This concept, sometimes embodied by the interpretative cannon *expression unius est exclusion alterius*—or "expressing one item of an associated group or series excludes another left unmentioned," is highly dependent on context or circumstances. *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288 (2017); *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) ("The force of any negative implication, however, depends on context."). Importantly, drawing the inference of exclusion is appropriate "only when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Democratic Republic of the Congo v. Air Capital Grp., LLC*, 614 F. App'x 460, 469 (11th Cir. 2015). The Court does not find the application of the doctrine here justified. The lists here, describing the way the first and second sections are joined, are not associated in such a way that the mention of one necessarily excludes the others. The lists, instead, identify different possible aspects of the foldable connection area: characteristics of the material at that connection (foldable or deformable); a type of material (fabric); the general mechanism or form of the connection (hinge or strap or other structure). (*E.g.*, '578 Patent, 4:58, 9:16–19, 17:1–2.) The items in the list are not all stand-alone descriptions of discrete concepts, describing distinct mechanisms for making that connection.

For the same reason, Group III's reliance on the disclosure-dedication rule, to the extent it is even applicable to a claim-construction analysis, is similarly misplaced. Under this rule, "When a patent drafter discloses but declines to claim subject matter, this action dedicates that unclaimed subject matter to the public." *SanDisk Corp. v. Kingston Tech. Co., Inc.*, 695 F.3d 1348, 1363 (Fed. Cir. 2012) (cleaned up). Unsurprisingly, the rule "is not without restriction." *Id.* Of note, "before unclaimed subject matter is deemed to have been dedicated to the public, that unclaimed subject matter must have been identified by the patentee as an alternative to a claim limitation." *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1379 (Fed. Cir. 2005). Here, Group III fails to establish that the items identified in the specification list represent distinct *alternatives* to the claim limitation. The context here is readily distinguishable from the disclosure-doctrine cases Group III relies on where, for example, the specifications provided for using aluminum, stainless steel, or nickel alloys but the patent only claimed the use of aluminum. *Johnson & Johnston Associates Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1055 (Fed. Cir. 2002); *see also, e.g.*, *PSC Computer Products, Inc. v. Foxconn Intern., Inc.*, 355 F.3d 1353, 1360 (Fed. Cir. 2004) (finding that alternative use of plastic clip parts was dedicated to the public where written description explained that plastic clip parts could be substituted for metal clip parts but only metal clip parts were claimed).

In sum, the Court finds "hinge" does not require construction and that Group III has failed to show that the circumstances here would warrant narrowing the word's plain meaning as it suggests. In other words, there are no "clear indications in the intrinsic evidence communicating an intent to depart from an ordinary customary meaning." *W.E. Hall*, 370 F.3d at 1353 (noting that any ambiguities as to whether a patentee used a claim term inconsistent with its ordinary and customary meaning must be disregarded). The Court finds "hinge" here to be readily understood as encompassing whatever components make up the connection point or juncture between the two sections, that keeps them joined to one another while also allowing them to fold away from one another to facilitate scanning.

### B. "substantially enclose"

The parties offer competing constructions for the term "substantially enclose," neither of which the Court adopts.

First, Group III proposes construing "substantially enclose" as "not enclose." (Def.'s Resp. at 17–19.) In support, Group III explains that "'substantially' communicates that the claim does *not* require a full enclosure," and then, from this, apparently concludes that this equates to a computer

being stored in the second pouch as being not actually enclosed. (*Id.* at 18 (emphasis in original).) The Court is unable to find the logic in Group III's proposal and otherwise finds no support for it. Without any apparent justification for doing so, Group III proposes a construction of "substantially enclose" that approaches the exact opposite of the meaning of the term rather than clarifying any potential ambiguities.

Targus, conversely, proposes that the Court construe "substantially enclose" as "substantially contain." (*E.g.*, Pl.'s Mot. at 12–14.) Targus justifies the construction by pointing out that "'enclose' can mean 'to hold or contain.'" (*Id.* at 12.) Continuing, Targus explains that, without the context of the '578 Patent, "'substantially enclose' refers to preventing the computer from falling out of the pouch, *i.e.*, containing it." (*Id.* at 13.) While Targus may be right that "substantially contain" could be a viable synonym for "substantially enclose," it fails to explain why such a construction, for a term that both parties seem to agree is straightforward and understandable, is necessary. Indeed, without more, merely replacing one understandable word with an equally-digestible synonym does nothing to enhance comprehension. *See Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*, 14-CV-3103 (SRN/FLN), 2016 WL 706190, at *12 (D. Minn. Feb. 22, 2016) ("Replacing 'chaotic' with 'unpredictable' or 'without a specific pattern' simply substitutes equally-understandable words for the inventor's already-understandable claim language and is unnecessary.")

To conclude, the Court finds no construction of "substantially enclose" necessary.

### C. "a first pouch" and "a second pouch"[2]

Group III urges the Court to construe "a first pouch" as "Parts of a case that retain an object on at least the bottom and the sides of the object" and "a second pouch" as "Parts of a case that retain an object on at least the bottom and the sides of the object and that are not the same parts as those that make of the 'first pouch.'" (Def.'s Resp. at 19.) In lobbying for its construction, Group

---

[2] Targus urges the Court to apply collateral estoppel to prevent Group III from relitigating its proffered construction. In support of its position—that collateral estoppel would apply in this way—Targus cites to *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998) and *SynQor, Inc. v. Vicor Corp.*, 2:14-CV-287-RWS-JBB, 2022 WL 6217132, at *12 (E.D. Tex. Sept. 26, 2022), *rep. & rec. adopted*, 214CV00287RWSJBB, 2022 WL 5318061 (E.D. Tex. Oct. 6, 2022) for the proposition that collateral estoppel applies to an *inter partes* review decision that construes claims. The Court can find no support for that proposition in either of those cases. Indeed, there appears to be authority to the contrary. *See SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed. Cir. 2016) ("[W]e cannot foresee how the claim construction reached by the Board in this case could satisfy [the] ordinary elements [of issue preclusion]."). Without more, Targus has failed to persuade, on this thin showing, that collateral estoppel applies in this way.

III points out that, in the context of the '578 Patent, a "pouch" is clearly something that "is used to retain an object within the bifold case." (Def.'s Resp. at 21.) Continuing, says Group III, any such pouch must "include[] the parts of a case that retain an object on at least the bottom and the sides of the object—so that the object would not fall out." (*Id.*)

The Court finds Group III's proposed construction inadequate. Although it lists some attributes of what a "pouch" may be, it falls short of shedding any light on the full contours of what a "pouch," in the context of the Patent, actually is. For example, certainly there is no denying Group III's unremarkable point that "a 'pouch' is used to retain an object within the bifold case." (*Id.*) The second part of Group III's proposed construction, that the parts of a case that comprise the pouch retain the object "on at least the bottom and the sides of the object" is no less unhelpful in clarifying the contours of the pouch. What does Group III consider the "bottom" of the object? Presumably, if that object is a laptop computer, being contained in the "second pouch," the "bottom" of the laptop is the side of the computer that would ordinarily fact down while it is in use, for example. But, then, what to make of the part of the "pouch" that retains the object on its "sides"? Does Group III's "pouch" require containment on *all* sides of the object? What if one or more of the object's sides, or portions thereof, protrude, uncovered from the "pouch"? Such a receptacle would not retain an object on all its sides or all parts of its sides—at least one side would be wholly exposed and parts of two other sides would be partially exposed. Such a container would seem to be improperly excluded using Group III's construction. Group III also fails to supply any probative evidence to the Court, in its briefing, to support its proposed construction.

Instead, within the parties' joint claim construction and prehearing statement, Group III points to the embodiment in Figure 13B of the Patent, reproduced below, as "evidence" supporting its construction. (Jt. Stmt., Ex. A., 4, ECF No. 58-1.)



Group III's position seems to be that what the figure identifies as "1306" qualifies as a "pouch." But the specification itself describes that aspect of the figure, marked as "1306," as a "recess," not a "pouch": "[t]he inner side 1309 of the second, computer storage section 1308 may comprise a **recess** 1306." ('578 Patent at 16:31–34 (emphasis added).) The specification further teaches that a computer could then be "secured within the recess 1306 using retention member 1330," which it explains could be "a cover (not shown), a strap, or other selective means (e.g., a friction fit, a lip on the recess 1306, webbing, one or more cords, or the like)." (*Id.* at 16:34–38.) The Court agrees with Targus that although covering the "recess" with a "cover" would form a "pouch," the recess by itself or even with the strap (or a friction fit, a lip, webbing, or one or more cords) is differentiated from the claimed "pouch." Accordingly, Figure 13B does not support Group III's definition of a "pouch."

For its part, Targus maintains "pouch" requires no construction or, if the Court finds that it does, should be construed as "a pocket or partially enclosed receptacle." (Pl.'s Mot. at 14.) In support of its position that no construction is necessary, Targus points to Figure 3B in the specification:



The specification explains, "The case 300 includes a pouch 302 that receives, supports, protects, and at least partially covers a portable computer 304." In the context of the patent, the Court agrees with Targus that "pouch" needs no construction as it would be readily understood by a jury.

Finally, the Court does not find Targus's alternate construction, defining "pouch" as either a "pocket" or "partially enclosed receptacle" helpful. It would

seem "pocket," alone, would reach too broadly, encompassing receptacles beyond a pouch. And Targus fails to explain why a "partially enclosed receptacle" is not already encompassed by the plain meaning of "pouch."

### D. "a first inner side" and "a second inner side"

Finally, Group III takes issue with the Patent's terms "a first inner side" and "a second inner side." (Def.'s Resp. 22–24.) Group III complains that "Targus is looking for a flexible scope these terms," protesting that Targus has shifted its definition of what part of the case comprises an "inner side" when mapping the terms to Group III's products. (*Id.* at 8, 22–24.) At the heart of Group III's argument are the following figures, reproduced from Group III's response:





(Def.'s Resp. at 8, 23.) Group III's complaint is that Targus's dashed green line encircling the "inner side" of the second storage section of an accused bag, on the left, is at odds with the dashed green line encircling a more circumscribed area of the inner side of what appears to be a second storage section from a different accused bag, on the right. Group III describes the image on the left as Targus's "initial," "previous," or "original position"—"before" the *inter partes* review—and the image on the right as Targus's "newfound current position"— "after" the *inter partes* review. (*Id.* at 8, 23–24.) Based on this discrepancy, posits Group III, the "inner side" could be either the inner side of the inner panel of a section or the inner side of an outer panel of that section. In other words, Group III's position is that the "inner side" can be the inner surface of the same piece of fabric that makes up the outer side of a storage section. Accordingly, Group III proposes construing "a first inner side" as "Any surface located within a case, including a surface opposite the 'first outer side' on the same panel as the 'first outer side.'" Similarly, Group III proposes construing "a second inner side" as "Any side located within a case that is not the 'first inner

side,' including a surface opposite the 'second outer side' on the same panel as the 'second outer side." The Court is not convinced.

Considering the patent as a whole, the Court concludes a jury would have no difficulty understanding what an "inner side" of one storage section is in relation to another storage section. The Patent describes each storage section, the first and the second, as having inner sides that "are disposed adjacent one another in the folded configuration and separated in an unfolded configuration." ("578 Patent at 20:45–47.) The Patent also explains that the first storage section, for example, is comprised of "a first outer side, a first inner side, a first proximal end, and a first distal end opposite the first proximal end, the first outer side, first inner side, first proximal end, and first distal end defining a first pouch." (*Id.* at 20:7–12.) Similarly, the second storage section is comprised of "a second outer side, a second inner side having a surface area approximately equal to a surface area of the first inner side, a second proximal end, and a second distal end opposite the second proximal end, the second storage section comprising, a second pouch." (*Id.* at 20:22–28.) It is readily apparent to the Court from the claim, that the described "inner sides" cannot be the inner surface of the same piece of material that makes up the outer side of a storage section. Such an interpretation would make it impossible, for example, for "the first outer side, first inner side, first proximal end, and first distal end" to "defin[e] a first pouch." (*Id.* at 20:9–12.) Instead, under Group III's construction, "the first outer side, first inner side, first proximal end, and first distal end" would simply define one side or part of a pouch.

Further, the parties both easily identify the same part of the case as the "inner sides" of the storage sections using Figure 10D:



**Group III's Depiction**          **Targus's Depiction**

(Def.'s Resp. at 22; Pl.'s Mot. at 19 (yellow highlights added by the Court in both images).) In light of these figures, Group III simply provides no support for

its proposed construction, that the inner side could *additionally* be the inside surface or face of an outer panel. Indeed, the Court can discern no support for construing "inner side" as only one surface, or face, of a particular panel of a storage section rather than the panel itself. In other words, the "inner side," as described in the Patent, is the "inner side" of a section as a whole; not the "inner side" of only a given panel of the section. The Court finds a jury would readily discern that the "inner side" refers to the part of the storage section that is on the inside of the bag as a whole (when closed) as opposed to the outer side which is the part of the storage section that is on the outside of the bag.

Nor does the Court find Targus's divergent mapping of the green dashed lines onto the inner sides of two different accused products (as depicted on page 12, above) supportive of Group III's construction. First, the cited to figures are contemporaneous, both found in exhibits attached to Targus's second amended infringement contentions which was served on Group III on October 25, 2022. (*See* Def.'s Resp., Ex. B to Pl.'s 2d Am. Infr. Cont., ECF No 119-2, 17; Def.'s Resp., Ex. C. to Pl.'s 2d Am. Infr. Cont., ECF No. 119-3, 16.) Accordingly, Group III's contention that the two figures show a change or evolution in Targus's position, over time, is without merit. Second, Targus's presentation of the two figures is focused on mapping an entirely separate claim requirement, that the inner sides "hav[e] a surface area approximately equal," onto two different accused bags. (Ex. B ("SwissGear 2700 USB Scansmart Laptop Backpack"); Ex C ("SwissGear 3670 Scansmart Laptop Backpack").) And, finally, Targus maintains that the green dashed line, encircling the "inner side" of the "second storage section," in the image on the left, was, in any event, in error. (Pl.'s Reply at n. 3 (citing Ex. B at 17).) Instead, says Targus, the green dashes should encircle only the corresponding part of the pouch as shown in the figure on the right, consistent with Targus's other depictions of the same accused product with respect to the mapping of other claim requirements—for example, the purple-shaded area and the area pointed to as the "[s]econd inner side" in the following two depictions:



(Ex. B at 15, 18.) In sum, Group III's description of the discrepancy between the two green, dashed lines in the two figures is inaccurate, irrelevant, and apparently based on a typographical error and, accordingly, does not persuade the Court that the term requires construction or, even if it did, that Group III's construction should be adopted.

### 4. Conclusion

For the reasons set forth above, the Court concludes the following terms, found within the claims designated, require no construction:

- "**a hinge**" (claims 1, 17, 21, 22, 28, 42, 50, 57);
- "**substantially enclose**" (claim 1);
- "**a first pouch**" (claims 1, 17, 21, 22, 28, 42, 48, 50, 57);
- "**a second pouch**" (claims 1, 4, 6, 17, 21, 22, 27, 28, 32, 42, 47, 48, 50, 57);
- "**a first inner side**" (claims 1, 17, 21, 22, 28, 42, 50, 57); and
- "**a second inner side**" (claims 1, 17, 19, 21, 22, 28, 31, 32, 33, 42, 50, 57).

On the other hand, the Court adopts the parties' now-undisputed proposed construction of "configured to enable a scanning device to scan through" (in claims 1, 17, 21, 22, 28, 42, 47, 50, 57) as "made of materials that do not interfere with a scanning device."

As such, the Court **mostly grants** Targus's opening claim construction brief (**ECF No. 107**), as fully set forth above.

**Done and ordered**, at Miami, Florida, on January 5, 2022.

Robert N. Scola, Jr.
United States District Judge